OPINION OF THE COURT
John Copertino, J.
This court has for its consideration, after a hearing at which the defendant did not testify but did call witnesses, the voluntariness of statements made by the defendant to officers of the Suffolk County Police Department.
The court’s findings of fact and conclusions of law follow.
At about 6:50 p.m. on January 19, 1981, Detective Me C of the Suffolk County Police Department Homicide Squad went to premises commonly known and referred to as 8 Nina Place in Farmingville where the homicide giving rise to the prosecution of this action occurred. Upon arriving he was informed by Patrolman Del G of this department that a Henry Schroeder had called the precinct the previous evening and reported that he had been threatened by a person known to him as “Billy the Kid”, while Schroeder had been at the above-mentioned premises. Del G stated that the only person he knew by that name was Billy Lucarano who lived at 5 Roslyn Avenue in Selden.
The following day, Me C called “Central Records” and was told that Lucarano had been arrested several times, the last having occurred on January 6, 1981, for a burglary. Defendant’s arrest records, Exhibits D and E, show a *662 number of arrests — approximately 11 — from December 19, 1979 to December 8, 1980, all with the notation “no disposition”, but do not mention the January 6 arrest.
Continuing with his investigation, Me C spoke to Detectives L, H, and T of the Fourth Squad Detectives who advised him that all of defendant’s “fumbles” stemmed from difficulties he was having as the result of his relationship with a married woman, a Patricia V, who lived in a neighboring community and that his last arrest, the one on January 6, came about when either she or her husband charged defendant with assault, trespass, burglary, and harassment.
Sometime during January 21, a call was received by Patrolman B of the Fourth Squad Detectives from defendant’s mother seeking help for him. Defendant had, at this point, been taken to Brookhaven Memorial Hospital along with Patricia V after an automobile accident which occurred while they were en route to a motel. It should be noted that defendant had become B’s informant after B had arrested defendant on December 8,1980, as the result of a burglary complaint made by the girlfriend’s husband. After this earlier arrest, defendant had been advised by B to get a lawyer, but defendant insisted it was “all bullshit. * * * going to Family Court.” B, learning that homicide was interested in Lucarano, called Me C and informed him that defendant wanted to talk to B about pressing charges against his girlfriend, because she had forced Valium on the defendant. It was ultimately agreed by Me C and B that they would go to the hospital to talk to defendant. Prior to leaving, Me C encountered Assistant District Attorney S, Chief of the Major Offense Bureau, who was at homicide on an unrelated matter. S, after learning from Me C or B that defendant had several prior pending charges, instructed Me C to inquire if defendant had an attorney, and that if defendant did not, it would be permissible to talk to him.
At the hospital, defendant recounted for the officers the events leading to his and Patricia V’s hospitalization, and informed them that he wanted to “sue” Patricia V for her having forced the Valium into him. At this point defendant asked if they would help him. Me C then asked defendant who would his lawyer be against Patricia V. The defendant *663 responded that he did not have a lawyer. Me C then inquired further by expressing disbelief that one with as many arrests as defendant had did not have a lawyer. Defendant said that he did not, that these arrests were “bullshit” arrests, that they were girlfriend and boyfriend arguments, that they would be resolved in the Family Court, and that he did not need a lawyer. The officers were unaware that on January 16,1981, defendant had failed to appear in the County Court for sentencing on convictions for grand larceny in the second degree and attempted burglary in the second degree. It should be added that B processed the December 8 arrest as petit larceny, issued defendant an appearance ticket, did not know what happened to those charges, and made no inquiry as to their status.
A decision was made not to arrest the defendant on the evening of January 21. It was decided to leave the defendant in the hospital. The following day, defendant signed himself out of the hospital and was then placed under arrest at 1:30 p.m.
Upon being arrested defendant was placed in the rear of a police vehicle by Detective Me C who joined the defendant. Detective E took the wheel and Me C informed defendant that he was under arrest for murder and read him the fourfold Miranda warnings. While they were being read to him, defendant mimicked Me C, and at its conclusion responded that he knew his rights, did not need a lawyer because he did not do anything wrong, and would talk to them. Some questioning took place in the vehicle en route to homicide. By 3:35 p.m., defendant had given both an oral and written statement to Me C and E.
Turning to the issues raised by People v Bartolomeo (53 NY2d 225), the Court of Appeals therein fastened upon the police the obligation to ascertain whether a defendant known to his interrogators to have been arrested a few days earlier for a serious crime, arson, was represented by counsel before an otherwise admissible statement can be taken from him. It is no longer permissible to rely on defendant’s declaration of the assistance of counsel alone. The court in a 4 to 3 decision speaking through Associate Judge Jones declared (pp 231-232): “Hence, the interrogat *664 ing detectives here, with actual knowledge of the outstanding arson charge against defendant, were under an obligation to inquire whether defendant was represented by an attorney on that charge. Having failed to make such inquiry, the officers were chargeable with what such an inquiry would have disclosed — namely, that defendant did have an attorney acting on his behalf.”
In a recent case decided by the Appellate Division of this department, People v Servidlo (77 AD2d 191) which involved a statement taken from a defendant who had charges pending against him “for some seven months previously” and who did not inform the police of this, a unanimous court rejected the argument that the police should be constructively charged with knowledge that he was represented by counsel. The case is instructive in that constructive knowledge imposes an impractical burden on law enforcement, either in examining the records of all the courts in the jurisdiction — and for that matter why not in this highly mobile society of ours contiguous jurisdictions as well — for each defendant about to be interrogated or keeping meticulously accurate and up to the minute police records of dispositions for each arrest a person has been subjected to. Constructive knowledge presupposes an omniscient infallible system.
Nor does Bartolomeo (supra) — decided some seven months after Servidio — suggest constructive knowledge. Bartolomeo requires no more than additional inquiry in the face of knowledge of a recent arrest.
Having concluded that Bartolomeo (supra) does not impose a rule of constructive knowledge, the question remains as to what the rule is when an officer learns of recent arrests from either his agency’s records or from a fellow officer, both of which occurred here. It was previously noted that constructive knowledge presupposes an omniscient infallible system, too great a burden to rest that rule on. In short, omniscience and infallibility are too much to expect of the record-keeping process. This court can see no reason why a less than perfect record-keeping system should, without more, operate to the advantage of the persistent offender. This court can see no reason why an officer who has made an arrest should, without more, be *665 charged with knowing at any given time what the status of the arrestee is independent of what his agency’s records show. The only practical alternative is to inquire of the defendant whether he has or has not counsel on previous charges.
Here, Me C was aware of prior arrests through his department’s records. Here B knew that defendant had been arrested recently because he, himself, had made the arrest. Yet, the records showed no disposition for each and every arrest. The only practical alternative was followed. The defendant, himself, was asked whether he had an attorney on the charges that were pending against him, and for whatever reason motivated him, chose to deny that there were in fact serious charges pending against him, charges which resulted in the imposition of a sentence of 2 Vs to 7 years. One can only infer that he chose to hide these charges because he was afraid that divulging them would result in his immediate incarceration. The reasons he gave for not having an attorney sounded credible considering what Me C and B knew about him and his paramour. Having been untruthful for whatever his reasons were, he should not be heard to complain at this time that he was interrogated in the absence of counsel on pending unrelated matters in the face of knowledge of recent arrests.
This court concludes then that the defendant was unequivocally accorded his constitutional rights under Miranda v Arizona (384 US 436), knowingly, intelligently and voluntarily waived these rights and agreed to speak to the police and that the statements attributed to him were voluntary beyond a reasonable doubt.
Accordingly, the motion to suppress the statements he made to the police and the corrections officer is denied.